MARTHA C. SIMERS, Plaintiff-Appellant, v. ROBERT L. BICKERS, Indiv. and d/b/a Fitted Contact Lens Company, Defendant-Appellee.

First District (3rd Division)   No. 1—90—1826

Opinion filed March 30, 1994.

A. Denison Weaver, of Chicago, for appellant.

Cassiday, Schade & Gloor, of Chicago (John D. Cassiday, James A. Foster, and Lynn D. Dowd, of counsel), for appellee.

PRESIDING JUSTICE TULLY delivered the opinion of the court: This case arises out of injuries sustained by plaintiff, Martha C. Simers, after defendant, not a licensed optometrist, fitted her with a pair of extended wear soft contact lenses (EWCL). Thereafter, plaintiff experienced complete blindness but has since recovered 30% of her vision. The jury returned a verdict in favor of defendant both on the negligence count and under the Illinois Optometric Practice Act of 1987 (225 ILCS 80/1 *et seq.* (West 1992)). The original trial resulted in a hung jury and the case was returned to the trial call. Count I of the complaint charged defendant, a lay person, with negligence in the dispensing and fitting of plaintiff with the contact lenses. The jury returned a verdict in favor of defendant as to count I. Count II alleged a statutory cause of action, charging a violation of the Illinois Optometric Practice Act. The trial court directed a verdict in favor of defendant on count II.

## FACTUAL BACKGROUND

Plaintiff had worn glasses since she was four years old, around 1960. Since 1966 she had been treated by Dr. William Cahill and

from 1971 through March 1983, plaintiff wore hard contact lenses. During this time plaintiff sustained corneal abrasions quite often and decided to pursue soft contact lenses.

Dr. Cahill introduced defendant, Robert L. Bickers, to plaintiff as his "contact lens man." Cahill would provide defendant with the prescription for contact lenses and defendant would then fit the lenses to the patient, who would in turn discuss any problems with the lenses with defendant. Defendant was not licensed as an optometrist or opthamalogist, but whether or not he was "qualified" under the Illinois Optometric Practice Act was an issue of law for the trial court.

Prior to the end of March 1983, plaintiff asked Dr. Cahill if she was a candidate for soft contact lenses. She was referred to defendant, Bickers, who subsequently fitted her for the lenses. After the initial fitting, plaintiff had two follow-up visits, wherein her eyes were dry and scratchy. Defendant gave her an artificial tears solution to remove the dryness. At the second follow-up visit everything looked "fine." Dr. Cahill also stressed the importance of cleaning and disinfecting the lenses.

In mid-April 1983, plaintiff moved to Denver, Colorado, and by the end of the month she had sustained problems with the lenses and she contacted Dr. Tarkanian. He told her not to wear the lenses at night and the problem cleared up. On May 18, 1983, plaintiff woke up in severe pain with a corneal abrasion. She was not wearing any lenses and was taken for emergency treatment. The hospital did not look at the lenses. The next day she went to Dr. Tarkanian's associate, Dr. Barker, who concluded she was experiencing a chemical burn. Barker also did not examine the contact lenses for bacteria.

On May 20, 1983, while in Denver, plaintiff stepped out of the shower and could not see. She was hospitalized several days and treated by Dr. Barker and his colleague, a corneal specialist, Dr. Forstot. As Dr. Forstot medicated plaintiff's eyes, she continued to improve.

In August 1983, plaintiff drove herself back to Chicago, where plaintiff was treated by Dr. Deutsche, an opthamalogist, in the presence of Bickers. Deutsche agreed with the medication treatment she was receiving.

Finally, after August 1983, plaintiff came under the care of Dr. Gerstein. Plaintiff never showed Gerstein her extended wear soft contact lenses. In June 1985, plaintiff was fitted with hard, gas permeable contact lenses by Gerstein.

Plaintiff was treated by a series of seven different eye technicians

or optometrists regarding the injuries she sustained subsequent to receiving the soft contact lenses from Bickers. Dr. Gerstein testified that in his professional opinion plaintiff's injuries were caused by the poor or inadequate fitting of the soft contact lenses by Bickers. Gerstein further testified that the fitting of a contact lens to a human eyeball was not within an optician's practice and should be conducted "by a practitioner trained in that field." He specifically believed that the extended wear lenses caused a lack of oxygen to the cornea, causing stromal scarring and a flattening of the cornea.

Defendant testified on his own behalf that he was not a licensed optometrist or a medical doctor licensed to practice in the State of Illinois. In 1967, he came to Chicago and formed the company, Fitted Contact Lens. He stated he did not conduct business as an optometrist and he would fit the doctors' patients for contact lenses. In consultation with Dr. Cahill, defendant determined plaintiff was suitable for extended wear lenses. Because plaintiff's prescription had not changed in 12 years, he told plaintiff he need not see her prior to the fitting.[1] Bickers checked whether the lenses were too loose or too tight on plaintiff. In June 1983, upon her returning to Chicago, defendant examined plaintiff with Dr. Deutsche, who concluded the cornea was clouded and distorted.

Dr. Cahill confirmed the testimony of defendant in relation to his own practice. Cahill also noted that plaintiff had a problem cleaning her lenses and there had been heavy build up on the lenses in the past. Cahill believed in his expert opinion that plaintiff's lenses were fitted properly by Bickers.

The physicians in Denver, Drs. Tarkanian, Barker and Forstot, did not render an opinion as to what caused plaintiff's injuries. Tarkanian believed changes in the cornea of plaintiff to be due to dryness, chemical burns or lack of oxygen to the cornea. Dr. Barker never saw the contact lenses but relied on Tarkanian's records to conclude the problem was on the surface of the eye and not inside. He diagnosed chemical keratitis in both eyes and decided the problem was either with the contact lenses themselves or the cleaning solution used by plaintiff. He treated her eyes with Tobrex and Maxitrol and told her to not wear the lenses for a while. He noted that the user of contact lenses plays a crucial role in their cleaning and maintenance. However, at the time of testifying, Barker believed plaintiff's eyes

---

[1]In fitting lenses, a keratometer is used to measure a small portion of the front central curvature of the cornea. To determine the lens power, defendant utilized the base curve of the lens. The base curve required was partly determined from plaintiff's prior keratometer reading.

were never infected and that the stromal[2] scarring could have occurred without any infection.

Dr. Forstot testified that the anoxia[3] experienced by plaintiff could be caused by tight-fitted lenses but he also believed that an extended wear contact lens user had a crucial role in cleaning and maintaining the lenses. The high altitude in Denver, with less oxygen, could also contribute to plaintiff's symptoms. Forstot did not believe an abscess resulted from an overwearing of the lenses. Forstot could not opine with any reasonable degree of medical certainty as to the source of plaintiff's problems. He did not rule out chemical burn or injury and he had no opinion as to whether the lenses were fitted improperly.

Dr. Louis Wilson, defendant's expert, worked with extended wear lenses, the same as those used by plaintiff. Wilson believed with a reasonable degree of medical certainty that defendant acted within the standard of care in fitting the lenses to plaintiff's eyes. He opined that defendant's reliance on a keratometry reading from 1971, when plaintiff's prescription had not changed in 12 years, was within the proper standard of care. He stated that the oxygen level was not a factor in determining a proper fit but the single most important factor was the lens prescription.

Wilson described defendant as a "contact lens technician" working under the supervision of an opthamalogist, specifically, Dr. Cahill. Defendant was never acting as an optometrist but was an "assistant" without any formal degree.

In Wilson's medical opinion, to a reasonable degree of medical certainty, plaintiff did not damage her eyes from hypoxia[4] or from a poorly fitted lens. Plaintiff's usage of the lenses in April and May of 1983 is inconsistent with such a conclusion. According to Wilson, it is not possible to have a tight-fitting lens without blurred vision. Then, when the lenses are removed, the cornea begins to breathe normally again and the vision is restored. In analyzing photographs of plaintiff's eyes, Wilson stated that the ring configuration of the cornea had a stromal abscess or infiltrate. This type of infiltrate resulted from bacteria. Wilson had never seen this before in any other acute hypoxic episodes in other patients wearing extended Permawear lenses.

Wilson criticized Gerstein's notes as incomplete. In Wilson's

---

[2]Stromal refers to any aspect of the iris.

[3]Anoxia refers to the absence of oxygen in the tissues.

[4]Hypoxia is a decrease below normal levels of oxygen in the surrounding blood or tissue.

expert opinion, an infection was caused with plaintiff's stroma.[5] Bacteria introduced to the surface of the eye could produce substances which pit the cornea and which could be the portal of entry. This type of phenomena was most common, stated Wilson, with soft contact lenses because of the care and cleansing required.

Wilson also stated in his expert medical opinion that no other explanation existed except that the plaintiff probably introduced onto the surface of the cornea an endotoxin[6] that led to a ring infiltrate or abscess. Wilson also testified that no one would ever know if there had been bacteria living in the cornea or not because cultures were never taken.

## ISSUES

There are two issues which we must analyze based upon the foregoing evidence: (1) whether the verdict as to count I, exonerating defendant from common-law negligence, was against the manifest weight of the evidence, and (2) whether the trial court erred in directing a verdict for defendant as to count II, finding that a cause of action had not been proven by plaintiff under the Illinois Optometric Practice Act.

## DISCUSSION

The most significant evidence supporting the jury verdict in defendant's favor would necessarily be the testimony of Dr. Wilson. On appeal, plaintiff contends this testimony is insufficient in that it is "based on nothing more than guess, speculation, conjecture and surmise." We initially note that a jury verdict will be reversed only if the evidence, when viewed most favorably to the prevailing party, so overwhelmingly favors the appellant that no contrary verdict could ever stand. *York v. Steifel* (1983), 99 Ill. 2d 312, 458 N.E.2d 488.

■ Under Illinois common law and the Illinois rules of evidence, an expert's opinions and conclusions are still subject to the fundamental requirement that they have some evidentiary basis. (134 Ill. 2d Rules 236(a), (b); Fed. Rules Evid. 703, 704, 705.) However, it is not necessary for hospital records to be admitted in order to elicit an expert medical opinion, regardless of whether the opinion is one of a treating or nontreating physician, so long as the information upon which the expert bases his opinion is reliable. *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322.

---

[5]A stroma refers to the framework of connective tissues of an organ, in this case the eye.

[6]Endotoxin refers to a bacterial toxin not freely liberated into the surrounding medium.

■ Plaintiff submits that the testimony of defendant's expert should have been stricken from the record because it was based upon "mere conjecture." However, it is not at all clear where Dr. Wilson begins to speak with any basis in fact. He continually refers to the hospital records and diagnoses which were in the record as well as the depositions of the other doctors. He relied heavily upon photographs of plaintiff's eyes in his final expert opinion that a bacteria probably entered the surface and later the cornea of plaintiff's eye.

Although Dr. Wilson's "theories" were partly based in facts before him and partly hypothetical, under *Clark*, hypothetical questions and data presented outside of court are acceptable bases for an expert opinion. (*Clark*, 84 Ill. 2d at 194, 417 N.E.2d at 1326.) The advisory committee note to Federal Rule of Evidence 703 clarifies this:

> "Facts or data upon which expert opinions are based may, under the rule, be derived from three possible sources. The first is the firsthand observation of the witness ***. *** The second source, presentation at the trial, also reflects existing practice. The technique may be the familiar hypothetical question or having the expert attend the trial and hear the testimony establishing the facts. *** The third source contemplated by the rule consists of presentation of data to the expert outside of court and other than by his own perception." (Fed. R. Evid. 703, Advisory Comm. Note.)

The central point of contention is the testimony that bacteria entered plaintiff's eyes from lack of cleaning the lenses. Wilson stated on cross-examination that he had to "surmise" the cause of the infection based upon all of the available evidence, *since a culture of the solutions used was never taken*. In *Nelson v. Speed Fastener, Inc.* (1981), 101 Ill. App. 3d 539, 428 N.E.2d 495, relied on by both parties, conjecture is defined as a conclusion based on assumption not in evidence or contradicted by the evidence. Dr. Wilson's opinions are not contradicted by all the testimony of the treating physicians. However, the other physicians do not render an expert opinion as to plaintiff's causing her own infection. The notion that bacteria somehow entered the cornea or eye surface by way of the cleansing process was implied by several physicians, beginning with Dr. Cahill. However, there exists no factual, scientific or expert evidence to support this.

Moreover, Wilson and the other testifying physicians failed to carefully examine the failure of Bickers to follow the manufacturer's guide in treating Ms. Simers. The Professional Fitting Guide recommended that a thorough, prefitting examination be performed

on the patient, which Bickers admitted he never performed. The manufacturer also recommended that the lens be evaluated two to four hours after the initial placement. Again, Bickers admitted that he did not do this. There was also no follow-up visit within 24 hours as recommended by the manufacturer. Under the diagnostic criteria in the guide, it says that upon applying the lens, the eyes may tear a little bit. Bickers never recorded whether or not Simers' eyes began to tear. The guide further instructs that an optimal fitting lens will cover the entire cornea. It then describes how the lens will move about the eye and drop back down. Bickers claims that this occurred although he never recorded it. Instead, Bickers' evaluation of the fitting was written as "Start extended wear, soft look good." At the examination one week later, Bickers did not recall the complaints of Simers: dryness, scrathiness, a lens popping out.

Bickers also admitted he did not perform a retinoscopy[7] examination, even though he recorded in the chart "crisp retinoscopy reflection." He also admitted that he never performed a keratometer examination and that one had not been performed in 12 years. Bickers said that Simers had experienced "corneal distortion" from the wear of hard contact lenses. This distortion would have been reflected by a keratometer reading but none was performed. Bickers could not recall whether Simers had complained about the soft contacts "around the clock, day after day" over a period of five days. After Simers complained of one of the lenses popping out, Bickers did not attempt to fit her with a different lens.

In addition, Bickers testified that there was no reason to disturb or reevaluate Simers' keratometer reading from 12 years prior in order to determine the proper lens size. Bickers then admitted that the only lens size he had available in his office was an 8.3. Therefore, it was impossible for Bickers to employ any trial and error method to check whether a different lens would have worked better.

Based upon the aforsaid actions of Bickers, we find that the verdict in this case was against the manifest weight of the evidence. We find that defendant was negligent in failing to properly follow the manufacturer's instructions in his treating of the patient. Whether or not these actions proximately caused plaintiff's injuries is a question of fact for the jury. Finally, we find that those portions of Dr. Wilson's testimony that plaintiff's eyes were infected due to her own lack of proper cleaning were mere conjecture and should have been stricken.

---

[7]A retinoscope is an optical device used to illuminate a subject's retina. Retinoscopy is a method of detecting errors of refraction by illuminating the retina and noting the direction and amount of light when a mirror is rotated.

The final issue to resolve is whether the trial court correctly determined that plaintiff did not bring forth enough evidence to support a cause of action under the Illinois Optometric Practice Act (the Act). Plaintiff contends that if the Act provides a private cause of action for either an express or implied violation, then absolute liability flows independent of fault, once there has been established a nexus between the violation and the injury. Defendant, on the other hand, argues that, assuming a violation of the Act, plaintiff has failed to prove the element of causation, as a matter of law, and therefore a directed verdict for defendant was proper.

■ First we consider whether defendant was "engaged in the practice of optometry" and was, thus, covered by the Act. Under *People ex rel. Watson v. House of Vision* (1974), 59 Ill. 2d 508, 322 N.E.2d 15, the court held that the dispensing, fitting and management of contact lenses amounted to the practice of optometry because the optician is required to come in actual contact with the customer's eyeball. Defendant claims he is covered on a section of the Act governing "assistants and technicians," but we note that defendant started his own company, Fitted Contact Lense, and he was not an employee of Dr. Cahill but an independent contractor. Because defendant was in violation of the Act, a statutory violation was presented by plaintiff.

■ Whether or not plaintiff is entitled to recover for this violation depends upon whether plaintiff can prove causation between the statutory violation, the illegal fitting of contact lenses, and the injury. This is a question of fact to be resolved by a jury.

It is clear that the Act restricts the practice of optometry to duly licensed individuals in order to protect the public health and welfare. Millions of people are treated every year in a similar way by technicians who are not licensed optometrists. The Illinois Optometric Practice Act was intended to protect our health and eyes, one of our most prized assets.

For all of the foregoing reasons, we find the verdict in this case as to count I was against the manifest weight of the evidence and the direction of a verdict in count II was improper.

Reversed and remanded.

RIZZI and GRIEMAN, JJ., concur.