# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Detention of New*, 2013 IL App (1st) 111556

---

| | |
|---|---|
| Appellate Court Caption | *In re* THE DETENTION OF JOHN NEW JR. (The People of the State of Illinois, Petitioner-Appellee, v. John New Jr., Respondent-Appellant). |
| District & No. | First District, Third Division<br>Docket No. 1-11-1556 |
| Filed | June 12, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The commitment of respondent as a sexually violent person was reversed and the cause was remanded for a *Frye* hearing to determine whether the expert testimony diagnosing respondent as suffering from paraphilia not otherwise specified, sexually attracted to adolescent males, also known as hebephilia, was sufficiently established to have gained general acceptance in the field in which it belonged, since respondent raised serious questions as to the validity and unorthodoxy of the diagnosis. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-CR-80002; the Hon. Michael McHale, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Stephen F. Potts, of Law Office of Stephen F. Potts, of Des Plaines, for appellant. |
| | |
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Michael M. Glick and Erica Seyburn, Assistant Attorneys General, of counsel), for the People. |
| | |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion. Presiding Justice Neville and Justice Pierce concurred in the judgment and opinion. |

## OPINION

¶ 1    Involuntary commitment under the Illinois Sexually Violent Persons Commitment Act (SVP Act) (725 ILCS 207/1 *et seq.* (West 2010)) is not punishment for the respondent's past crimes, nor should it be. The proceeding under the SVP Act is a statutorily created civil action that considers the respondent's current mental state to determine the likelihood of respondent engaging in further acts of sexual violence on his or her release. Essentially, the respondent's liberty is tied to an assessment of the mental disorder and the risk of future sexual offenses. These cases turn on expert testimony.

¶ 2    Respondent John New, Jr., appeals his commitment raising four issues: (i) whether the court should have held a *Frye* hearing to determine whether the State's expert testimony regarding his diagnosis was admissible; (ii) whether the State improperly presented evidence of certain psychological conditions not asserted in its petition; (iii) whether the SVP Act is constitutional as applied to New; and (iv) whether the evidence at trial supported New's commitment as a sexually violent person. Finding the trial court erred by failing to conduct the *Frye* hearing, we reverse and remand.

¶ 3                    I. BACKGROUND
¶ 4              A. New's Life and Criminal History
¶ 5    New did not testify, and the trial consisted of expert testimony only. We review the expert testimony with the understanding that none of the experts had personal knowledge of the events to which they testified.

¶ 6    New was born on April 29, 1963. He was diagnosed with bipolar disorder as a child. When he was seven, he began consuming alcohol. In his teens, he smoked marijuana. When he was young, a male neighbor sexually abused New, holding him at knife point and forcing New to perform oral sex. In 1980, New, 17, was caught performing oral sex on a 15-year-old boy. It is unclear whether this sex was consensual. New was convicted of contributing to the

sexual delinquency of a child and received supervision.

¶ 7    When New was 23 he had a sexual encounter with an 11-year-old boy in an abandoned warehouse. A few months later, New met the boy, who was then 12, and his friend, also age 12, on the street and bought them dinner. The three went to the same warehouse and the boy performed anal sex on New. The friend declined New's invitation to participate. New later stated that he believed the friend was 17 and the boy was 15. As a result of these encounters, New pleaded guilty to two counts of aggravated criminal sexual assault and was given seven years in prison.

¶ 8    In 1992, New was placed on mandatory supervised release. During his release, New was arrested for soliciting prostitution from an undercover male police officer whom New described as young-looking. New's parole was revoked, and he returned to the Illinois Department of Corrections. New again received mandatory supervised release in 1994.

¶ 9    Thereafter, New took a job as a camp counselor for the Chicago park district. Watching the children in the locker room aroused New. Occasionally, after observing the children, New would go to a bar and pick up an adult male to perform oral sex on while fantasizing about the children. New solicited sex from one of the children attending the camp. The child refused but took $35 from New to help find a willing partner. The boy identified another camper who was willing to have sex with New for money. In July 1995, in a swimming pool locker room, New performed fellatio and anally penetrated the 14-year-old camper and then had the camper perform oral sex on him. New was charged and convicted of one count of aggravated criminal sexual assault and two counts of criminal sexual assault. Certified as a "habitual sexual offender or child sexual offender," New was sentenced to nine years in prison. Later New said that he believed the camper, who was a ward of the state, was 15 years old.

¶ 10    In prison New underwent limited substance abuse and sex-offender treatments. The sex-offender treatment consisted of six months of group therapy. New reported that he quit participating in the treatment because he felt he was not learning much, and because he was uncomfortable with the female therapist's suggestion to masturbate.

¶ 11    New was scheduled for release in 2004. But 37 days before his release date, New was accused of fondling the genitalis of a 19-year-old inmate who had recently arrived from the youth facility. The inmate was a 6-foot 3-inch, athletic, black male with no facial or chest hair. New later stated that this inmate made him "thirsty" and aroused. New requested the inmate be transferred into his cell. He sexually fantasized about the inmate, imagining that the inmate had no pubic hair. As a result of the fondling incident, New pleaded guilty before the prison's adjustment committee and received a sexual misconduct ticket, delaying his release until March 2005. New later claimed that the inmate welcomed his advances.

¶ 12    In March 2005, the State filed a petition to have New committed as a sexually violent person. The trial court held a probable cause hearing in December 2005 and found probable cause to detain New at a facility of the Illinois Department of Human Services. While there, New met a young-looking, bearded 20-year-old whom New had coached in 1994, when the man was around 11 years old. New requested to room with the man and also admitted he was attracted to him. Additionally, New requested to room with several residents at the facility

and became angry when his requests were denied. At the human services facility, New successfully completed the orientation group, the introduction to thinking errors groups, and the anger management group. He participated in the tactics group and the life stressors group, but did not participate in sex-offender treatment.

¶ 13                                    B. The SVP Act Trial

¶ 14      The SVP Act trial occurred in November 2010 before a jury. Three experts testified: Drs. Fogel and Brucker for the State, and Dr. Witherspoon for New.

¶ 15                                    1. Dr. Fogel's Testimony

¶ 16      Dr. Michael Fogel is a forensic psychologist. Based on his education and experience, Fogel was qualified as an expert in clinical psychology in the area of assessing the risk that a sex offender will re-offend.

¶ 17      Fogel reviewed New's master file, including his mental health evaluations, records of his current and previous medical issues, statements of facts from the State's Attorney's office, and police reports of various criminal offenses. Clinical psychologists generally rely on and accept these documents in evaluation of sex offenders. Fogel interviewed New twice, in 2004 and 2010. He also conducted two psychological tests, called the Hare Psychopathy Checklist Revised and the Static 99.

¶ 18      Referring to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, Text Revision (DSM-IV-TR) (published by the American Psychiatric Association, the manual provides the definitions of psychiatric diagnoses and is considered the definitive reference for the categorical classification of mental disorders), Fogel testified that New suffers from "paraphilia, not otherwise specified, sexually attracted to early pubescent males." Fogel defined early pubescence as between 11 and 14 years old. Paraphilia, a general class of sexual disorders, is characterized by current, intense sexually arousing fantasies involving sexual urges or behaviors generally involving (i) nonhuman objects, or (ii) the suffering or humiliation of oneself or another, or children or other nonconsenting persons that occurs over a period of six months. Further, the person must have acted on his or her sexual urges, or the sexual urges or fantasies must have caused the person marked distress or inner-personal difficulty. The "not otherwise specified" diagnosis indicates that New meets the paraphilia diagnostic criteria in the DSM-IV-TR, but he does not fall neatly into one of the named categories, such as voyeurism, sadism, or pedophilia. The "sexually attracted to early pubescent males" is the specific diagnosis, the type of paraphilia.

¶ 19      The DSM-IV-TR describes paraphilias as "mental disorders [that] are characterized by sexual fantasies, urges, or behaviors involving non-human objects (coprophilia, fetishism, transvestic fetishism), suffering or humiliation (sexual sadism, masochism), children (pedophilia) or other non-consenting person (voyeurism, frotteurism, exhibitionism)." There is a debate whether to include a diagnosis of hebephilia in the upcoming DSM-V, and according to Fogel, the proposed definition for hebephilia in the DSM-V is the same as New's diagnosis of paraphilia not otherwise specified, sexually attracted to early pubescent persons. (Hebephilia refers to sexual attraction to pubescent children, that is to say, those

-4-

early in their sexual development, around the ages of 11 to 14. Pedophilia, unlike hebephilia, involves sexual attraction to prepubescent children, generally younger than 11.)

¶ 20    Fogel testified that New also suffered from antisocial personality disorder involving a pervasive pattern of disregard for or violation of the rights of others. Fifty to eighty percent of individuals that are incarcerated suffer from antisocial personality disorder. Fogel admitted that New's antisocial personality disorder alone would not determine him to be a sexually violent person.

¶ 21    According to Fogel's analysis, New had suffered under and acted on his sexual urges toward adolescent males since his twenties. New chose his victims based on looks (preferring tall, athletic, African American, young-looking men without facial or chest hair), and vulnerability, typically, those who had a history of sexual abuse. Fogel noted that New befriended younger boys, often overestimating their age, and would then fantasize about them. Fogel said New described himself at times as a passive recipient of the boys' advances, and at other times admitted that he sought out certain individuals.

¶ 22    New told Fogel that he has sexual fantasies about adolescent males and felt somewhat powerless over his urges. Specifically, that he masturbated while fantasizing about performing oral sex on young-looking inmates and on adolescent television actors. Fogel reported that, before being imprisoned, New used marijuana to alleviate his shame about these fantasies, though the shame did not stop him from re-offending. New told Fogel that he would not solicit minors again because he feared spending the rest of his life in prison.

¶ 23    On a standardized actuarial measure (similar to those developed by insurance companies) known as the Static 99, New scored in the high range. Fogel said the Static 99 evaluates a man's risk of committing future sex offenses based on objective data in 10 static categories, including his age, his romantic partners, and whether his victim was male and unrelated to him. The Static 99 is the most researched, cross-validated, and widely used actuarial measure for sexual recidivism. On the Static 99, New scored a seven, placing him at a high risk of re-offending when compared to other male sex offenders. Among others in the high risk category, 26% committed a sexual offense within 5 years, 34% within 10 years, and 37% within 15 years. But, because these percentages excluded unreported offenses, some reported offenses that did not result in an arrest, and some reported offenses that did not result in formal charges, the percentages underestimate the actual recidivism rate. Fogel admitted that he did not use updated, more accurate actuarial measures, either the Static 99R or the Static 2002R. Fogel testified that New would have scored a six on the updated measures, a score that still places him in a high risk category.

¶ 24    On the Hare Psychopathy Checklist, New showed a moderate range of psychopathic personality traits. The checklist considers two factors: (i) an individual's "personal affective component of the psychological contract of psychopathy," and (ii) antisocial personality traits. In the later, New was in the twentieth percentile among the male prison population. Psychopathic personality traits include callous, remorseless, and manipulative behaviors.

¶ 25    Fogel testified that, while a paraphilia diagnosis did not predispose a person to be sexually violent, New's paraphilia diagnosis did because of serious difficulty controlling his sexual urges. In support, Fogel pointed to New's history of sexual offenses, which continued

despite legal sanctions, and his continued sexual attraction to adolescent males.

¶ 26    New claimed during his interview with Fogel that he would be less likely to re-offend if he had a community to support him. Fogel spoke with New's mother and stepfather. Neither of them was aware of New's history of sexual offenses or the victims' ages. Fogel said that since New's mother and stepfather did not know about his history, they would not be able to offer the kind of support New needed.

¶ 27    Other risk factors associated with recidivism increased New's risk that he would re-offend. These factors include: (i) never having completed sex-offender treatment; (ii) the lack of a long-term romantic relationship; (iii) a history of establishing relationships with vulnerable youth in an effort to sexually offend; (iv) poor control over his sexual impulses; (v) the lack of concern for others; and (vi) his attitude of condoning or excusing his own sexual offenses.

¶ 28    Fogel also considered factors that might mitigate New's risk of re-offending: (i) New's age; (ii) his limited participation in sex-offender treatment; (iii) his claim that he suffered from erectile dysfunction; and (iv) his family support system. Fogel felt neither New's age at trial, 42, nor the other factors mitigated the risk that New would sexually re-offend.

¶ 29    Fogel testified that New's paraphilia would not go away without treatment, though he admitted that treatment could be on an out-patient basis. Taking into account New's paraphilia, history of sexual offenses, and the results of the Static 99 measure, along with New's exposure to risk factors associated with recidivism, Fogel concluded that there was a substantial probability New would commit an act of sexual violence in the future, although Fogel admitted no tests determine with absolute certainty whether a sex offender will re-offend.

¶ 30                    2. Dr. Brucker's Testimony

¶ 31    The State's other expert, Robert Brucker, examined New, too. Brucker is a licensed clinical psychologist. The court certified him as an expert in clinical psychology, specifically relating to sex-offender evaluation, risk assessment, and treatment.

¶ 32    Brucker reviewed New's master file and interviewed him in January 2006. Brucker administered three written psychological tests: (i) the Minnesota Multiphasic Personality Inventory II (MPPI-II), a psychological test designed to collect information about an individual's mental health issues and personality traits; (ii) the Millon Clinical Multiaxial Inventory III (MCMI-III), a test similar to the first except that it focuses on chronic personality traits; and (iii) the Multiphasic Sex Inventory III, which provides information related to people and their tendencies and thoughts related to sex offending. Brucker updated his report in December 2009 with additional medical and treatment documents, and psychological evaluations.

¶ 33    Brucker noted that New's history of sexual offenses and sexual misconduct showed that his victims were typically between 12 and 15 years old, and that New's behavior did not change, even after being imprisoned. Brucker testified that New suffered from five mental disorders. The first disorder was paraphilia not otherwise specified, sexually attracted to adolescent males, nonexclusive type. Brucker defined paraphilia in the same way as Fogel,

and added that the diagnosis did not necessarily indicate criminal behavior, but did indicate deviant sexual interest. Brucker found New's paraphilia manifested in his recurrent sexual interest in teenage boys, and his desire to room with young-looking people in the correctional and mental health facilities. Brucker also noted that New acknowledged that teenage males arouse him, and that he fantasizes about them while masturbating, though New denied this attraction after 2005.

¶ 34    The second, third, and fourth disorders were alcohol dependence with physiological dependence in a controlled environment, cannabis dependence without physiological dependence in a controlled environment, and cocaine abuse. Brucker testified that New began using alcohol and marijuana at the age of seven. New consistently abused alcohol up until his 1995 incarceration, but reportedly stopped using marijuana at age 21. New began to abuse cocaine around age 14 or 15, but could not afford the drug most of the time. Brucker noted that while alcohol was not currently available to New, every time New was released, he would rush back to using alcohol and was reportedly under the influence of substances each time he committed a sexual offense. The fifth mental disorder was antisocial personality disorder.

¶ 35    New's paraphilia, according to Brucker, affected his volitional capacity in that he could not stop himself from engaging in sexual conduct with boys between the ages of 12 to 15 and predisposed him to commit acts of sexual violence. In reaching this conclusion, Brucker used three actuarial instruments–the Static 99, the Static 99R, and the Minnesota Sex Offender Screening Toll, Revised (MnSOST-R)–and considered other risk factors related to predicting future sexual offenses. Brucker admitted that using multiple actuarial instruments may not increase the prediction's accuracy. Again, New scored a seven on the Static 99, placing him in a high risk category. On the Static 99R, New scored a six, also placing him in a high risk category. On the MnSOST-R, which considered additional risk factors not included in the Static 99 or 99R, New scored a 14, the highest risk category.

¶ 36    Other risk factors Brucker considered included New's deviant sexual interests, his antisocial personality disorder, an elevation in the psychopathic deviant scale on the MPPI-II, interpersonal relationship conflicts, and intoxication while offending. Brucker also considered New's age, sex-offender treatment, and any serious and debilitating medical conditions. Brucker concluded that New's age did not lower his risk of sexually re-offending, and that New did not have a serious or debilitating medical condition that would prevent him from offending.

¶ 37    Brucker opined New's paraphilia, other diagnoses, and other risk factors increased New's likelihood of sexually re-offending, and that, due to his mental disorders, it was substantially probable that New would commit future acts of sexual violence.


¶ 38                    3. Dr. Witherspoon's Testimony

¶ 39    Dr. Kirk Witherspoon, a licensed psychologist, testified on New's behalf. The court certified Witherspoon as an expert in forensic psychology with a specialty in consulting evaluations.

¶ 40    Witherspoon conducted a clinical interview with New in January 2010 and reviewed

New's criminal history, mental health records, Department of Corrections records, human services records, and other evaluators' reports regarding New's condition. In addition, Witherspoon conducted a mental status exam, a four-year structured sentence completion test, a personal problems checklist, a personality disorder or psychopathology test called the MCMI-III, the MnSOST, informal sexual attitude and interest questionnaires, and a sexual history form.

¶ 41    Witherspoon interpreted these tests in the context of the same information considered by Fogel and Brucker. Witherspoon testified that New's substance abuse disorder was either in remission or resolved, and that New had a personality disorder with mild antisocial and histrionic traits. Witherspoon said that New's history of sexual offenses did not indicate he had a mental disorder because "it's normal for adults to be sexually attracted to other adults and also to sexually immature adolescents," and while illegal to act on those feelings, it is not considered a pathology. Witherspoon said that paraphilia not otherwise specified, sexually attracted to adolescent males, is not a generally accepted diagnosis, unlike pedophilia, where a person is sexually attracted to children who have not reached puberty.

¶ 42    As to risk assessment, Witherspoon used a structured risk assessment method called the Sexual Violent Risk 20 (SVR 20), which evaluates a person's deviant sexual attitudes and interests, interpersonal relationships, and self-management difficulties. He also employed the Static 2002R, and another tool that measured more dynamic variables. On the SVR 20, New fell into a moderate category of risk. Comparing the Static 2002R with the Static 99 and Static 99R, the Static 2002R is more accurate and uses more conceptually meaningful categories than mere statistical correlation. On the Static 2002R, New scored in the moderate high category, but Witherspoon adjusted that to low/moderate based on the SVR 20 and New's health problems. On cross-examination, Witherspoon admitted that he improperly scored the Static 2002R, and that New was actually in a high risk category before the adjustment. Witherspoon believed that New did not need sex-offender treatment and had only a 15% chance of re-offending, and that chance would decrease each year until, after 10 years, there was almost no chance New would re-offend.

¶ 43                    4. Verdict and New's Posttrial Motion

¶ 44    The jury found New to be a sexually violent person under the SVP Act. The court committed New to a treatment facility with the Illinois Department of Human Services. New filed a motion for a new trial. The circuit court denied the motion, and this appeal followed.

¶ 45                            II. ANALYSIS

¶ 46                    A. New's Diagnosis and *Frye*

¶ 47    Fogel diagnosed New with "paraphilia, not otherwise specified, sexually attracted to early pubescent males." Brucker diagnosed New with "paraphilia not otherwise specified, sexually attracted to adolescent males, non-exclusive type." New contends that the mental disorder about which Fogel and Brucker testified should have been subjected to a *Frye* hearing to test its admissibility. New contends the mental disorder is novel, not generally accepted in the community of mental health professionals, and its diagnosis cannot produce reliable results.

The State responds that *Frye* does not apply to a diagnosis because a diagnosis does not constitute a scientific principle or methodology. Our standard of review of the denial of a motion *in limine* based on a *Frye* issue is *de novo* review. *In re Commitment of Simons*, 213 Ill. 2d 523, 531 (2004).

¶ 48   The SVP Act authorizes the involuntary civil commitment of "sexually violent persons" for "control, care and treatment." 725 ILCS 207/40(a) (West 2010). The SVP Act defines a "sexually violent person" in two parts. First, as "a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of a sexually violent offense by reason of insanity." 725 ILCS 207/5(f) (West 2010). And second, as a person "who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2010).[1]

¶ 49   The SVP Act defines a "mental disorder" as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2010). The courts have defined "substantially probable" to mean " 'much more likely than not.' " *In re Detention of Bailey*, 317 Ill. App. 3d 1072, 1085-86 (2000). If the court or jury is "satisfied beyond a reasonable doubt that the person is a sexually violent person," he or she may be indefinitely committed "until such time as the person is no longer a sexually violent person." 725 ILCS 207/35(f), 40(a) (West 2010).

¶ 50   Illinois has adopted the standard set forth in *Frye v. United States* (293 F. 1013 (D.C. Cir. 1923)) with regard to the admissibility of expert testimony. *In re Commitment of Simons*, 213 Ill. 2d 523, 529 (2004). The *Frye* standard is codified in the Illinois Rules of Evidence: "Where an expert witness testifies to an opinion based on a new or novel scientific methodology or principle, the proponent of the opinion has the burden of showing the methodology or scientific principle on which the opinion is based is sufficiently established to have gained general acceptance in the particular field in which it belongs." Ill. R. Evid. 702 (eff. Jan. 1, 2011).

¶ 51   New contends that a diagnosis of paraphilia not otherwise specific, sexually attracted to adolescents, is hebephilia. The State disagrees with this conclusion, but the State's expert, Dr. Fogel, agreed that his diagnosis was a hebephilia diagnosis. As part of his motion *in limine* to exclude the diagnosis, New cited numerous academic articles that questioned the validity of categorizing hebephilia as a mental disorder. A proponent of including hebephilia in the upcoming DSM-V, Dr. Ray Blanchard, defined hebephilia as an erotic preference for pubescent children, around the ages of 11 to 15. Ray Blanchard *et al.*, *Pedophilia, Hebephilia, and the DSM-V*, Archives of Sexual Behavior (2008). But opponents contend the hebephilia diagnosis may dramatically expand or add "to the DSM diagnostic categories of mental disorders without any evidence or reasoning that those who would be newly

_____

[1]After 2010, the Generally Assembly updated the definition of a sexually violent person to include specific offenses, but because New conceded at trial that his criminal history satisfied the first portion of section 5(f), those updates are not relevant. See Pub. Act 96-1551 (eff. July 1, 2011); Pub. Act 97-1150 (eff. Jan. 1, 2013).

included under the mental disorder rubric can be properly categorized as mentally disordered." Philip Tromovitch, *Manufacturing Mental Disorder by Pathologizing Erotic Age Orientation: A Comment on Blanchard et al. (2008)*, Archives on Sexual Behavior (2008) (letter to the editor); see also Karen Franklin, *Hebephilia: Quintessence of Diagnostic Pretextuality*, Behavioral Sciences & the Law (2010) ("unlike the listed examples of paraphilias not otherwise specified in the DSM-IV-TR, which are all extremely rare, adult male attraction to adolescent children is common"); Gregory DeClue, *Should Hebephilia Be a Mental Disorder? A Reply to Blanchard et al. (2008)*, Archives on Sexual Behavior (2008) ("The decision to classify a pattern of sexual attraction as a mental disorder (paraphilia) inevitably entails more than (1) reliable differences in patterns of sexual attractions and (2) checking law books to see which sexual activities are currently illegal in a particular jurisdiction." (letter to the editor)); Thomas K. Zander, *Adult Sexual Attraction to Early-Stage Adolescents: Phallometry Doesn't Equal Pathology*, Archives on Sexual Behavior (2008) ("Clinicians who are currently using the miscellaneous DSM diagnosis of paraphilia not otherwise specified to pathologize adult sexual attraction to adolescents of all stages of sexual development are creating a diagnosis on an *ad hoc* basis." (letter to the editor)).

¶ 52    As a noun, "a diagnosis" is defined as the "determination of a medical condition (such as a disease) by physical examination or by study of its symptoms. The result of such an examination or study." Black's Law Dictionary 518 (9th ed. 2009). As a verb, "to diagnose" indicates process and method, and is defined as the "art or act of identifying a disease from its signs and symptoms." Webster's Third New International Dictionary 622 (1993). The State's argument conflates these two usages.

¶ 53    As these definitions indicate, diagnosing a medical condition, in this case a mental disorder, by considering characteristic signs and symptoms presupposes a mental condition exists as a matter of scientific evidence. Put another way, a prerequisite for a diagnosis is scientific evidence that such a mental condition exists. Absent reliable scientific validation or acceptance of the mental condition, its presence would be merely theoretical. Before diagnosis comes identifying, naming, describing, and classifying the condition. A *Frye* hearing is appropriate to determine whether an emerging diagnosis is an actual illness or disorder. See *Bernardoni v. Industrial Comm'n*, 362 Ill. App. 3d 582, 594 (2005) ("[G]enerally, if the proposed testimony concerns a syndrome that has not yet been admitted in Illinois, then the trial court should conduct a *Frye* hearing to determine the scientific validity, or invalidity, of the syndrome."); *People v. Taylor*, 552 N.E.2d 131, 134-35 (N.Y. 1990) (applying *Frye* to validity of rape trauma syndrome); *Kuxhausen v. Tillman Partners, L.P.*, 197 P.3d 859, 863 (Kan. Ct. App. 2008) (applying *Frye* to determine validity of emerging diagnosis accepted by only limited number of medical doctors); *cf. In re Marriage of Bates*, 212 Ill. 2d 489, 519-20 (2004) (discussing application of *Frye* to validity of parental alienation syndrome, though deciding case on other grounds).

¶ 54    If we were to accept the State's arguments, litigants could proffer fictional conditions. Justice does not put the fact finder in the position of culling good science from bad. Moreover, the State's distinction would so narrow the *Frye* test as to make it almost meaningless. The purpose of a *Frye* hearing is to safeguard the court's truth-finding role (*People v. Zayas*, 131 Ill. 2d 284, 294 (1989)), ensuring that the fact finder cannot make

findings based on unsound science.

¶ 55    The State points to case law from other jurisdictions holding that psychological diagnoses are not subject to *Frye*. We find their cases distinguishable. In *In re the Detention of Berry* (248 P.3d 592 (Wash. Ct. App. 2011)), the Washington Court of Appeals held that the diagnosis of a mental disorder was not subject to a *Frye* hearing because psychological analysis is a generally accepted methodology, and because arguments as to the validity of a diagnosis go to the weight of expert testimony, not admissibility. *Berry*, 248 P.3d at 595-97. But this is beside the point. The issue here is the validity of the mental disorder. Unless established, we expose the justice system to avenues of future regret, whereby a so-called mental disorder that has not reached, and may never reach, a critical mass of general acceptance yet forms the basis of an individual's loss of liberty. A *Frye* hearing was meant to preclude this kind of "junk science."

¶ 56    In *Westerheid v. State*, 767 So. 2d 637, 657 (Fla. Ct. App. 2000), the court declined to address the *Frye* issue, but noted in *dicta* that "neither expert used any psychological profile or syndrome designed to identify violent sexual predators which may very well be subject to a *Frye* analysis. Rather, both experts rendered their opinions in this case based on their training and experience." *Westerheide*, 767 So. 2d at 657. The Florida court in *Westerheide* relied on the pure opinion exception to *Frye*. See *Noakes v. National R.R. Passenger Corp.*, 363 Ill. App. 3d 851, 858 (2006) ("Pure opinion testimony that does not involve a new or novel scientific technique or procedures or depend upon new or novel scientific principles to support its conclusion need not be subjected to a *Frye* test."). But that exception does not apply. Fogel and Brucker based their testimony on more than their training and experience. Indeed, it is difficult to imagine a forensic psychologist testifying that a respondent is substantially likely to commit acts of sexual violence in the future based on his or her training and experience alone.

¶ 57    The third case, *People v. Ward*, 83 Cal. Rptr. 2d 828 (Cal. Ct. App. 1999)*,* held that under California law scientific evidence, but not expert medical opinion, is subject to *Frye*. *Id.* at 831. The court reasoned "[n]o precise legal rules dictate the proper basis for an expert's journey into a patient's mind to make judgments about his behavior," and that psychological evaluation is "a learned professional art" while *Frye* only applies to "exact sciences." (Emphasis omitted and internal quotation marks omitted.) *Id.* We do not find the characterization of psychology as an art to be a meaningful one under *Frye*. "[T]he *Frye* rule is meant to exclude methods new to science that undeservedly create a perception of certainty when the basis for the evidence or opinion is actually invalid." *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 78 (2002). It is not the purview of the courts to exclude entire fields of study from the general acceptance test because those sciences are "softer," while allowing experts in those fields to present opinions that create a perception of scientific certainty. Creating these exceptions opens the justice system to abuse.

¶ 58    Also of import, a liberty interest is at stake in proceedings under the SVP Act. Liberty includes the right to "generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men" and women. (Internal quotation marks omitted.) *Ingraham v. Wright*, 430 U.S. 651, 673 (1977). "Because involuntary commitment procedures implicate substantial liberty interests, the respondent's interests

-11-

must be balanced against the dual objectives of involuntary admissions: (1) providing care for those who are unable to care for themselves due to mental illness and (2) protecting society from the dangerously mentally ill." *In re Lance H.*, 2012 IL App (5th) 110244, ¶ 21. Thus, the purpose of civil commitment is treatment, not punishment. *Id*. As is noted in the DSM-IV-TR, a "mental disorder" denotes the boundary between "normality and pathology." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders xxxi (4th ed., text rev. 2000).

¶ 59    This boundary in involuntary commitment proceedings is the difference between treatment and impermissible retribution. See *Kansas v. Hendricks*, 521 U.S. 346, 373 (1997) (Kennedy, J., concurring) ("[I]f it were shown that mental abnormality is too imprecise a category to offer a solid basis for concluding that civil detention is justified, our precedents would not suffice to validate it."). That is, if a respondent in an SVP proceeding does not suffer from an actual mental disorder, then there is nothing to cure, and commitment is pointless. Accordingly, we hold that a diagnosis of a novel condition is subject to the general acceptance test under *Frye*.

¶ 60    The State further argues that it sustained its burden of showing general acceptance. The proponent of the evidence bears the burden of showing general acceptance. *People v. McKown*, 236 Ill. 2d 278, 294 (2010); Ill. R. Evid. 703 (eff. Jan. 1, 2011). A proponent can prove general acceptance through the "use [of] scientific publications, prior judicial decisions, practical applications, as well as the testimony of scientists as to the attitudes of their fellow scientists." *People v. Kirk*, 289 Ill. App. 3d 326, 332 (1997). General acceptance does not mean universal or even majority acceptance, but requires a showing of reasonable reliance by experts in the relevant field. *In re Commitment of Simons*, 213 Ill. 2d 523, 529-30 (2004). Behind the general acceptance test is the idea that there is value in consensus.

¶ 61    In his motion *in limine*, New raised serious questions regarding the validity and unorthodoxy of the State's diagnosis of paraphilia not otherwise specified sexually attracted to adolescent males, also known as hebephilia. In response, the State argued that because paraphilia not otherwise specified was in the DSM-IV-TR, it was a generally accepted diagnosis, but did nothing to show that the addendum to the diagnosis "sexually attracted to early pubescent males" was generally accepted as a mental disorder. At the hearing before the trial court, the State admitted that there was controversy regarding the addendum its experts attached to the diagnosis. The State did not provide support showing that the addendum was generally accepted. As the proponent, the State bore the burden of showing general acceptance. Therefore, the court should have conducted a *Frye* hearing, and it is error to fail to do so. See *In re Detention of Hargett*, 338 Ill. App. 3d 669, 675 (2003) (reversing for refusal to hold a *Frye* hearing in SVP Act case).

¶ 62    Accordingly we reverse and remand for a *Frye* hearing, and, if necessary, a new trial.

## B. Diagnoses Not Pleaded in the State's Petition

¶ 64    Before trial, New requested an instruction that the jury could not commit him based on any mental disorder other than the paraphilia diagnosis. The trial court denied this motion. New argues that the trial court erred in permitting the State to elicit testimony and argue for

involuntary commitment based on mental disorders not pleaded in its petition. We review the trial court's decision for an abuse of discretion, which occurs where "the instructions mislead the jury and result in prejudice to the litigant." *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 79. We find no prejudicial or misleading variance between the pleadings and proof.

¶ 65    The State's SVP Act petition must allege, among other things, that the respondent "has a mental disorder" and "is dangerous to others because [his or her] mental disorder creates a substantial probability that he or she will engage in acts of sexual violence." 725 ILCS 207/15(b)(4), (b)(5) (West 2010). A "mental disorder" is "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2010). In other words, to state a cause of action, the State needs to plead, among other things, the respondent's mental disorder, its affect on his or her volitional or emotional capacity, and a substantial probability that due to the mental disorder the respondent will commit future acts of sexual violence.

¶ 66    Generally, in civil litigation, variance between the pleadings and the proof "will not be deemed material unless it misleads the adverse party to his [or her] prejudice." *Cummings v. Dusenbury*, 129 Ill. App. 3d 338, 346 (1984); *Tomlinson v. Dartmoor Construction Corp.*, 268 Ill. App. 3d 677, 685 (1994).

¶ 67    The State's petition alleged New suffers from the mental disorder paraphilia not otherwise specified, listing no other mental disorders. At trial, Fogel and Brucker testified that New suffered from (i) paraphilia not otherwise specified, sexually attracted to early pubescent persons, (ii) antisocial personality disorder, and (iii) numerous substance abuse disorders. In closing argument, the State urged that all of these mental disorders together made it much more likely that New would commit sexual violence again.

¶ 68    "[F]or a variance between allegations and proof to constitute reversible error, the variance must be shown to be material," misleading one party to its prejudice. *Tomlinson v. Dartmoor Construction Corp.*, 268 Ill. App. 3d at 685. New fails to show any prejudice from the variance between the State's pleadings and the proof.

¶ 69    New submits that any variation between the pleadings and proof constitutes reversible error. We disagree that this is the current standard in Illinois. Although case law states that "proof without pleadings is as defective as pleadings without proof" (*Colonial Inn Motor Lodge ex rel. Cincinnati Insurance Co. v. Gay*, 288 Ill. App. 3d 32, 40 (1997)), this is tempered by the requirement that the party objecting to the variance show prejudicial effect. *Cummings v. Dusenbury*, 129 Ill. App. 3d at 346. Prejudice often takes the form of surprise. None appears here since New's expert rebutted the State's diagnosis of substance abuse disorders and mitigated the antisocial personality disorder diagnosis. See *Losurdo Bros. v. Arkin Distributing Co.*, 125 Ill. App. 3d 267, 271 (1984) (holding objection to variance waived where party introduces evidence rebutting unpleaded allegations). Thus, we find no prejudice resulting from the variance.

¶ 70                         C. As-applied Constitutionality of the SVP Act
¶ 71    Next, New argues that the Cook County circuit court applies the SVP Act in an

unconstitutional manner by treating a civil proceeding as a criminal case. New supports his contention by noting that in Cook County, SVP Act cases: (i) are adjudicated by judges in the criminal division, (ii) are given criminal case numbers, (iii) are assigned to the criminal appeals division at the State's Attorney's office, and (iv) take place in the criminal court's building.

¶ 72     We find the issue procedurally defaulted and decline to address it. New provides no framework, cites no law, and offers little guidance as to why the circuit court's treatment of SVP Act cases violates the due process or equal protection clause. Under Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013), appellants must present fully developed arguments with adequate legal and factual support or face procedural default. *Housing Authority v. Lyles*, 395 Ill. App. 3d 1036, 1040 (2009). The challenging party has the burden to show a statute is invalid over the strong presumption favoring constitutionality. *People v. Masterson*, 2011 IL 110072, ¶ 23. New has not met his initial burden to comply with the appellate rules. *Id*.

¶ 73                      D. New's Commitment as a Sexually Violent Person

¶ 74     Because we reverse and remand this case for a *Frye* hearing and possibly retrial, we decline to review the results of New's first trial.

¶ 75                                   III. CONCLUSION

¶ 76     For the reasons stated above, we reverse and remand for a *Frye* hearing, and if necessary, a new trial.

¶ 77     Reversed and remanded.