# Illinois Official Reports

## Appellate Court

*In re Detention of Melcher*, 2013 IL App (1st) 123085

| | |
|---|---|
| Appellate Court Caption | *In re* THE DETENTION OF MARK MELCHER (The People of the State of Illinois, Petitioner-Appellee, v. Mark Melcher, Respondent-Appellant). |
| District & No. | First District, Second Division<br>Docket No. 1-12-3085 |
| Rule 23 Order filed<br>Rule 23 Order<br>withdrawn<br>Opinion filed | October 29, 2013<br><br>December 3, 2013<br>December 17, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The order committing respondent as a sexually violent person was upheld where respondent's failure to make an adequate offer of proof forfeited his claim that he was improperly barred from presenting proposed lay witnesses as to his rehabilitation, he did not show how he was prejudiced by the State's failure to include all of the diagnoses alleged at trial in the petition, the State's experts were properly allowed to testify as to the diagnosis of paraphilia not otherwise specified, nonconsenting females, without a *Frye* hearing, respondent forfeited his claim that no dispositional hearing was held before the order of commitment was entered, and the evidence established beyond a reasonable doubt that he was a sexually violent person. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-80011; the Hon. Michael McHale, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Law Office of Stephen F. Potts, of Des Plaines (Stephen F. Potts, of counsel), for appellant.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Michael M. Glick and Lindsay Beyer Payne, Assistant Attorneys General, of counsel), for the People.

Panel

PRESIDING JUSTICE QUINN delivered the judgment of the court, with opinion.
Justices Harris and Simon concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, respondent Mark Melcher was found to be a sexually violent person (SVP) under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2012)), then committed to the custody of the Illinois Department of Human Services (DHS). On appeal, respondent contends: (1) that he was denied the right to present a defense when the trial court barred him from calling lay witnesses; (2) that the State should not have been allowed to seek commitment for psychological diagnoses not alleged as mental disorders in its petition; (3) that the trial court erred in admitting testimony regarding the diagnosis of paraphilia not otherwise specified (PNOS), nonconsenting females, without a *Frye* hearing; (4) that the trial court erred by not holding a dispositional hearing; and (5) that the State failed to prove he was an SVP beyond a reasonable doubt. For the following reasons, we affirm.

¶ 2                                   I. BACKGROUND
¶ 3    On May 18, 2010, the State filed a petition alleging respondent to be a sexually violent person. The petition cited respondent's three prior convictions for aggravated criminal sexual assault and alleged that he suffered from "Paraphilia, Not Otherwise Specified, Mixed features, Non Consenting Persons." Counsel was appointed to represent respondent. On June 7, 2010, after a hearing, the trial court found probable cause to believe that respondent was a sexually violent person. The matter was then set for trial.

¶ 4    Prior to trial, the State filed a motion *in limine* to bar the testimony of six lay individuals listed as witnesses by respondent. Respondent claimed that these witnesses could testify to his "personal background, penitentiary background, likelihood to re-offend, religious conversion and mental condition." At a hearing on the State's motion, the court asked counsel for respondent how the testimony of these witnesses was relevant. Counsel argued that "these persons can talk about who [respondent] is now as a person and what changes that he's gone through in his personality and his conduct when he was incarcerated in the Department of

- 2 -

[C]orrections." The court said, "Sounds like character evidence to me. How is it not character evidence or is it?" To which counsel replied, "I think that's what we're talking about, Judge. I think we're talking about [respondent] as a person and who he is or whether he has changed from the sexual predator that he was when he went into the Department of Corrections into a different person." Ultimately, the court granted the State's motion, noting that there was a "strong possibility" that the proposed testimony would confuse the jury and that counsel was "basically talking about character evidence and I don't think in this proceeding that character evidence is of a degree of relevance that should be admissible." The court informed counsel, however, that it would revisit its ruling in the event a lay witness could rebut a specific fact relied on by a witness.

¶ 5    Respondent filed a motion *in limine* before trial as well seeking to bar the State's experts from testifying about a diagnosis of "Paraphilia Not Otherwise Specified Sexually Attracted to Nonconsenting Females, Nonexclusive Type," pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). He argued that PNOS nonconsent is not generally accepted as a valid diagnosis and cannot be applied in a manner that produces reliable results. The trial court disagreed and denied the motion, noting that "the DSM-IV does contain the diagnosis of paraphilia NOS." The court also cited the case of *McGee v. Bartow*, 593 F.3d 556 (7th Cir. 2010), stating, "that court while acknowledging there is a debate in the scientific community regarding this diagnosis felt that it has still gained enough acceptance in the scientific community that it is proper to be admitted as a diagnosis." Its ruling notwithstanding, the court informed the parties that counsel would be allowed "to cross on the debate within the scientific community if he so desires."

¶ 6    Respondent's jury trial was held in late August 2012. At that trial, the State called Dr. Raymond Wood as an expert in the field of clinical and forensic psychology, specifically in the areas of sex offender evaluations, diagnosis, and treatment. Dr. Wood conducted a clinical evaluation of respondent to determine whether he was an SVP and prepared a report dated August 19, 2010.

¶ 7    Dr. Wood initially testified to the details of respondent's criminal history. He testified that respondent's first sexual offense occurred in 1986. In that incident, respondent accosted a 17-year-old female as she was walking to the McDonald's where she worked, dragged her into a wooded area, and attempted intercourse and oral sex. She eventually escaped when respondent walked away, possibly to urinate. Later, she went back to the scene looking for some missing items and found respondent's wallet. Respondent was arrested and gave a statement to police in which he attributed his actions to intoxication.

¶ 8    While out on bond for that offense, respondent committed two additional offenses. In October 1986, a woman returned to her car after shopping in a White Hen Pantry, looked in the backseat, and saw respondent lying on the floor facedown. She went back into the store and called police, and respondent got out of her car and drove off in another car. He was arrested by police, who observed his car straddling lanes, weaving, and hitting a curb.

¶ 9    In February 1987, at the age of 30, respondent was arrested for another sexual assault. In that case, a 20-year-old victim was in her car after work with the door closed when respondent got in and told her to "shut up." After a struggle, he told her that "he would not hurt her if she

would just put her arms around him." Respondent then fondled her breasts, pulled down her underwear, and inserted his fingers into her vagina. The victim later convinced respondent that she needed to get in the backseat, at which point she escaped and began to scream for help. A witness heard the scream, chased respondent, and was able to hold him until police arrived.

¶ 10    Respondent pleaded guilty to the first sexual assault and the one in February 1987 and received seven-year sentences in both cases. Dr. Wood testified that he spoke with respondent about these offenses and that respondent attributed them to his intoxication.

¶ 11    Respondent was paroled in May 1990. On July 15, 1990, respondent kidnapped a seven-year-old child from her home and sexually assaulted her in a field. He pleaded guilty to three counts of aggravated criminal sexual assault, home invasion, and aggravated kidnapping, and was sentenced to concurrent, respective terms of 40, 40, and 15 years' imprisonment. Dr. Wood testified that prior to that incident, the Alsip police department was also investigating a similar incident in which respondent had attempted to lure an eight-year-old into the woods under the pretext of looking at "Sacadias." Additionally, on July 20, 1990, the Midlothian police department received a report from a 35-year-old woman that respondent had grabbed her arm when she tried to leave his home. Dr. Wood spoke with respondent about these three incidents, and respondent said that the incident on July 20, 1990, "was 90 percent made up by the police and that the victim colluded with them in that." He admitted to the incident on July 15, 1990, however, and again attributed his actions to drinking.

¶ 12    Dr. Wood testified that respondent has reported 172 victims: including 12 sexual assaults, 11 attempted sexual assaults, and incidents of voyeurism and frottage. He has also reported once wrapping a belt around his victim's throat, as well as an uncharged offense where he hid in a woman's car, had her drive to another location, and sexually assaulted her. Dr. Wood noted that, since 1992, respondent has received 32 disciplinary reports while in the Illinois Department of Corrections (IDOC): 21 for minor rule infractions and 11 for major rule infractions.

¶ 13    Dr. Wood testified that respondent has a history of alcohol and cannabis abuse for which he has previously received substance abuse treatment. Dr. Wood also testified that respondent has not attended any sex offender treatment in the community or in IDOC. He is now in sex offender treatment at the treatment and detention facility and he is at phase two of a five-phase treatment plan. Dr. Wood testified that completion of sex offender treatment is important because it helps reduce recidivism and that no other methods or processes reliably decrease the risk of an SVP.

¶ 14    In June 2010, Dr. Wood administered three psychological tests to respondent, including the second version of the Minnesota Multiphasic Personality Inventory (MMPI-2), and the second version of the Multiphasic Sex Inventory (MSI-2). The MMPI-2 indicated that respondent "was very engaged in image management" and "wanted to present himself as an almost impossibly good individual." The MSI-2 similarly indicated "a fake good profile," *i.e.*, respondent "was attempting to put an improbably better foot forward." These results suggested to Dr. Wood that respondent had sexual interest and arousal to children and that he "could not admit or would not admit that he had attempted to manipulate a child for sexual purposes." Dr. Wood testified that respondent had "beliefs and attitudes that were similar to those of a known

group of child molesters," but that he "did not share that commonality of attitude involved with rapists."

¶ 15 Dr. Wood opined that respondent suffers from: (1) paraphilia not otherwise specified, sexually attracted to nonconsenting females, nonexclusive type; (2) pedophilia, sexually attracted to females, nonexclusive type; (3) alcohol dependence in a controlled environment; (4) cannabis dependence; and (5) personality disorder not otherwise specified with antisocial traits. He also opined that respondent's mental disorders are congenital or acquired conditions affecting his emotional or volitional capacity and that they predispose him to engage in future acts of sexual violence. Dr. Wood testified that respondent's five mental disorders work together to aggravate his condition, and he provided the jury with the bases for his diagnoses.

¶ 16 Dr. Wood performed an adjusted actuarial assessment to determine respondent's risk of reoffending, using two actuarial instruments: the Static 99-R and the Minnesota Sex Offender Screening Tool Revised (MnSOST-R). On the Static 99-R, respondent originally scored a "4" putting him at a moderate-high risk. Dr. Wood changed the score to a "5," also a moderate-high risk, and testified that respondent most resembled the high-needs, high-risk sample group. On the MnSOST-R, respondent scored a "16," which put him in "the refer category," meaning that he "would be referred for commitment unless there were compelling reasons not to."

¶ 17 Dr. Wood identified several additional risk factors for respondent: (1) he suffers from a personality disorder; (2) he reported being sexually abused as a child; (3) he indicated sexual interest in children; (4) he saw himself at no risk to recidivate; (5) he has a history of substance abuse; (6) he was intoxicated during the offense; (7) he has a history of nonsexual crime; (8) he has a history of nonviolent crime; (9) he has deviate sexual interests; (10) he has attitudes supportive of child sexual abuse; (11) he has violated conditions of release; and (12) the rapidity with which his offenses have occurred after one another.

¶ 18 Dr. Wood also considered factors associated with a reduced risk of reoffending, including age, medical condition, and participation in sex offender treatment. He testified that the Static 99-R adequately took respondent's age into account, however, and that respondent did not suffer any disabilities that would decrease his risk of reoffending. He also noted that respondent was at a very early phase of sex offender treatment and that he would not "expect it to offer any protective influence at all."

¶ 19 Dr. Wood opined that it was substantially probable that respondent would engage in further acts of sexual violence due to his mental disorders and that respondent was dangerous as a result. Further, he opined that respondent meets the requirements of the Act.

¶ 20 On cross-examination, Dr. Wood acknowledged that respondent told him about religious work with which he was involved. However, Dr. Wood stated that there is no research indicating that religious work reduces risk; to the contrary, research suggests that "those who are most religious are apt to commit the more severe offenses." Dr. Wood also acknowledged that PNOS nonconsent is a controversial diagnosis.

¶ 21 Dr. Vasiliki Tsoflias also testified for the State as an expert in the field of forensic and clinical psychology, with a specialty in the area of risk assessment of sex offenders. In April 2010, Dr. Tsoflias conducted an SVP evaluation of respondent. After initially reviewing

respondent's IDOC master file, she attempted to interview him, but he declined to participate in the interview. He told Dr. Tsoflias that "he wasn't prepared for the interview, [that] he didn't know if it would benefit him in any way, *** that he had become very religious while he was in prison and he was no longer a threat to the community, and that, upon release, he was planning on moving out of the state of Illinois so he wouldn't be a threat in this state anymore." Dr. Tsoflias completed her evaluation using the documents that she had and prepared a report dated May 10, 2010.

¶ 22    Dr. Tsoflias testified that she considered respondent's criminal sexual history in making her evaluation as well as the fact that respondent received 46 disciplinary tickets during his incarceration, 2 of which were major violations. She further noted that respondent never attended sex offender treatment in the community or while incarcerated, but she acknowledged that he is now participating in such treatment at the Department of Human Services (DHS).

¶ 23    Dr. Tsoflias diagnosed respondent with PNOS, mixed features, nonconsenting persons. "Mixed features" refers to the fact that respondent's victims are both adults and children. After stating the basis for her diagnosis, Dr. Tsoflias testified that PNOS, mixed features, nonconsenting persons, is a congenital or acquired condition affecting respondent's emotional or volitional capacity and that it predisposes him to commit future acts of sexual violence.

¶ 24    Dr. Tsoflias conducted a risk assessment to determine respondent's likelihood of committing future acts of sexual violence. Like Dr. Wood, she administered the Static 99-R and the MnSOST-R. On the Static 99-R, respondent scored a "4," indicating a moderate-high risk of reoffending in the next 5 to 10 years. On the MnSOST-R, respondent scored a "14," indicating a high risk of reoffending in the next six years.

¶ 25    Dr. Tsoflias identified several additional risk factors for respondent: (1) he has never completed a sex offender treatment program; (2) he has problems with general criminality and lifestyle instability; (3) he committed an offense while on parole; (4) he has intimacy deficits; (5) he used violence and threats to force compliance from his victims; (6) he has a problem cooperating with supervision; (7) he has problems with general self-regulation; (8) he has problems with hostility; and (9) he has problems with cognitive problem solving. She testified that none of the protective factors, *i.e.*, factors that decrease one's likelihood of reoffending, applied. Ultimately, she opined that it is substantially probable that respondent will engage in future acts of sexual violence and that respondent meets the criteria of an SVP.

¶ 26    On cross-examination, Dr. Tsoflias stated that respondent reported being involved in prison ministry at IDOC, but that she did not seek out more information. She stated that there is no research to show that a religious conversion decreases risk of reoffending; to the contrary, there is research that shows it might contribute to one's risk of reoffending. Dr. Tsoflias also acknowledged that there is some controversy regarding whether PNOS is always diagnosed accurately. She stated that the controversy is "due to the fact that people are basing the diagnosis solely on criminal behavior, or their rap sheet, for example, and their arrest rather than looking at the actual behavior that is involved."

¶ 27    The State introduced into evidence respondent's prior convictions for aggravated criminal sexual assault on August 16, 1991, criminal sexual assault on February 19, 1987, and

aggravated criminal sexual assault on February 10, 1987. The State then rested its case-in-chief.

¶ 28    The defense called Dr. Luis Rosell as an expert in the field of sex offender evaluations, treatment, and risk assessment. Dr. Rosell testified that his evaluation of respondent consisted of reviewing several hundred pages of records, including police records, corrections records, and the evaluations of Drs. Wood and Tsoflias, meeting with respondent for three hours, and preparing a report dated September 9, 2010.

¶ 29    Dr. Rosell testified that respondent told him that his employment history involved electronics and computers. He also testified that respondent had a "significant" substance abuse history involving marijuana and alcohol, but that respondent denied using any substances during his incarceration. Dr. Rosell acknowledged that respondent has had "a few" disciplinary reports in IDOC, but he "didn't see them as being significantly problematic."

¶ 30    Respondent was not involved in sex offender treatment in IDOC because he felt that he was getting the help he needed through his religious studies. Respondent's spiritual awakening began in 1992, and he attended bible studies and services and also acted as a mentor to other individuals. An interview Dr. Rosell had with Pastor Ted Chatman confirmed respondent's participation in religious activities.

¶ 31    Dr. Rosell reviewed respondent's criminal history as part of his evaluation and testified that respondent "pretty much acknowledged what the records say is what occurred." He also testified that respondent had recently begun treatment at the DHS facility and that he was rated "favorable" regarding disclosure and responsibility on December 29, 2011.

¶ 32    Dr. Rosell diagnosed respondent with alcohol and cannabis dependence as well as personality disorder with antisocial features by history. He does not believe the substance abuse diagnoses are mental disorders under the Act. As for personality disorder, he acknowledged that such a diagnosis could qualify as a mental disorder under the Act, but he does not believe that it does in this case due to respondent's age. Dr. Rosell testified that he did not diagnose respondent with PNOS, nonconsenting females, "[b]ecause that diagnosis doesn't exist in the DSM-IV." He further opined that respondent does not suffer from any mental disorders under the Act or from any acquired or congenital mental disorders that would lead him to engage in future acts of sexual violence.

¶ 33    Dr. Rosell performed a risk assessment of respondent using the Static 99-R and Static 2002R. Respondent scored a "4" on the Static 99-R, putting him in the moderate-high risk category. Dr. Rosell also found additional factors from the SVR-20 present, including: (1) supervision failures, (2) substance abuse, (3) physical harm to his victims, (4) nonsexual violent offenses, and (5) negative attitudes toward intervention. He nonetheless opined that it was not substantially probable that respondent would commit a sexually violent offense if released. On cross-examination, Dr. Rosell acknowledged that there is no research indicating that religion reduces the risk of sexual reoffending.

¶ 34    Respondent testified that he is 55 years old. He was married from 1985 to 1991 and has a 25-year-old son. When he returned to IDOC in 1992, respondent was "[v]ery confused and pretty much thought [his] life was over." He was then approached by "Christians of the church

- 7 -

of the inmates" and began attending services and bible studies. After undertaking three months of intensive studying, he has been "progressing" ever since. Respondent does not deny his past behavior and testified that he was "the worst of all sinners" and would "take it all back" if he could. Besides his religious activities, respondent has worked different jobs in IDOC, painted, and had one-on-one time with the chaplains. He also quit using substances cold turkey.

¶ 35 Respondent acknowledged receiving a violation for fighting when he "put [his] hand on an inmate to push him away from [his] sleeping area." He testified that the inmate was "a little unstable" and was coming into his area. Respondent also acknowledged receiving a violation for business activity when he sold his artwork to a woman who ran an art gallery.

¶ 36 Respondent testified that he was willing to undergo treatment at DHS because counsel told him to do it. He is complying with the treatment and is at the end of phase two. He still continues with his Bible studies, prayer, and meditation.

¶ 37 Respondent rested his case. During the jury instructions conference, counsel argued that the jury should be instructed that they could only find respondent an SVP based on the mental disorder alleged in the State's petition, *i.e.* PNOS nonconsent. He also requested special interrogatories with regard to that point. The trial court did not specifically rule on respondent's proposed jury instruction. However, the court found that respondent was not prejudiced by the fact that the State did not amend its petition to include the additional diagnoses mentioned at trial and noted that a civil complaint is not analogous to a petition under the Act because the latter "is simply supposed to be a bare-bones document basically for the Court to have a probable cause hearing." The court denied respondent's proposed special interrogatories.

¶ 38 Following deliberations, the jury returned a verdict finding respondent to be an SVP. The State then immediately requested that respondent be committed to a secure care facility pursuant to section 40 of the Act (725 ILCS 207/40 (West 2012)). Counsel requested a hearing; however, the trial court found that a dispositional hearing was not necessary based on the evidence that it heard at trial and ordered that respondent be committed to the DHS treatment and detention center. Respondent now appeals pursuant to Illinois Supreme Court Rule 303 (eff. May 30, 2008).

¶ 39                                                     II. ANALYSIS
¶ 40                                         A. Right to Present a Defense
¶ 41 Respondent first contends that he was denied the right to present a defense, a fair trial, due process, and fundamental fairness where the trial court barred him from calling his proposed lay witnesses. He claims that these witnesses would have testified regarding their contact with respondent during his incarceration, his attempts at rehabilitation, his community support system, and his behavior and conduct while incarcerated "as it related to his predisposition to commit acts of sexual violence if released and whether it evidenced a mental disorder." The State argues that the trial court did not abuse its discretion in barring the testimony of respondent's lay witnesses and that respondent had no constitutional right to present their testimony.

¶ 42    Under the Illinois Rules of Evidence, "[a]ll relevant evidence is admissible, except as otherwise provided by law. Evidence which is not relevant is not admissible." Ill. R. Evid. 402 (eff. Jan. 1, 2011). Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). "The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion." *People v. Becker*, 239 Ill. 2d 215, 234 (2010).

¶ 43    In the case at bar, we find that the trial court did not abuse its discretion in barring respondent from calling his lay witnesses in light of the irrelevancy of their proposed testimony. At a trial under the Act, the ultimate issue is whether respondent is a sexually violent person. 725 ILCS 207/35(a), (f) (West 2012). A sexually violent person is one "who has been convicted of a sexually violent offense *** and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2012).

¶ 44    Here, counsel argued at the motion *in limine* hearing that the lay witnesses he was seeking to call on respondent's behalf would have testified about "who [respondent] is now as a person and what changes that he's gone through in his personality and his conduct when he was incarcerated in the Department of [C]orrections." The trial court noted that this sounded like character evidence, and counsel agreed, stating, "I think that's what we're talking about, Judge. I think we're talking about [respondent] as a person and who he is or whether he has changed from the sexual predator that he was when he went into the Department of Corrections into a different person." The problem is that respondent's "character" was not the issue in this case; the issue was whether respondent was dangerous because he suffered from a mental disorder that made it substantially probable that he would engage in acts of sexual violence. Contrary to respondent's claim, the purported testimony of his proposed lay witnesses was not probative of this latter, largely scientific, question. Their testimony would have been essentially nothing more than observations of respondent's daily behavior in the penitentiary without any psychological analysis to give the behavior significance. While there is no question that respondent has a right under the Act to present and cross-examine witnesses at his jury trial (725 ILCS 207/25(c)(3) (West 2012)), the right to present a defense does not include the right to introduce irrelevant evidence (*People v. Lowitzki*, 285 Ill. App. 3d 770, 779 (1996)).

¶ 45    In claiming that the testimony of his lay witnesses was relevant to the issue of whether he was an SVP, respondent calls our attention to the fact that, in a criminal trial involving the insanity defense, lay witnesses may testify regarding behaviors that either rebut or affirm the insanity defense. Although at first glance this argument may appear persuasive, respondent's analogy is ultimately unavailing. The defense of insanity is fundamentally different from the issue in an SVP proceeding. Whereas the defense of insanity concerns a defendant's state of mind at the time of an offense (720 ILCS 5/6-2(a) (West 2012)), the issue in an SVP proceeding is whether respondent suffers from a mental illness that makes it substantially probable he will engage in future acts of sexual violence (725 ILCS 207/5(f) (West 2012)). A

lay witness's testimony regarding a defendant's behavior at the time of a crime may allow a jury to assess the credibility of an insanity defense. It does not follow, however, that a lay witness's testimony of a respondent's current behavior would assist a jury in assessing whether respondent suffers from a mental disorder that makes it substantially probable he will commit *future* acts of sexual violence. To the contrary, this is an area more properly confined to expert analysis backed by scientific data, lest the jury be given free rein to engage in rank speculation about a respondent's propensity. Respondent's reliance on insanity defense cases is thus misplaced.

¶ 46    Respondent nonetheless objects that he was denied the opportunity "to rebut the State claims of his behaviors with testimony of his witnesses." This claim, however, is belied by the record. Although the trial court barred respondent from calling his proposed lay witnesses, the court specifically informed counsel that it would revisit its ruling in the event a lay witness could rebut a specific fact relied on by a witness. Respondent never took up this offer and rested on his own testimony and that of his expert. "To preserve an error in the exclusion of evidence, the proponent of the evidence must make an adequate offer of proof in the trial court." *Northern Trust Co. v. Burandt & Armbrust, LLP*, 403 Ill. App. 3d 260, 280 (2010). "Failure to make an adequate offer of proof results in forfeiture of the issue on appeal." *Northern Trust Co.*, 403 Ill. App. 3d at 280. Under the circumstances, respondent has forfeited any claim that he was denied the opportunity to present a lay witness to rebut a fact relied on by the State's experts. We therefore affirm the order of the trial court barring respondent's lay witnesses from testifying.

¶ 47                B. Commitment on the Basis of Diagnoses Not Pleaded in the SVP Petition

¶ 48    Respondent's second contention is that the State should not have been allowed to seek commitment for psychological diagnoses other than PNOS where no other mental disorders were alleged in the SVP petition. He claims that allowing the State to do so was a fundamental error requiring reversal of his commitment.

¶ 49    The State responds that the trial court did not abuse its discretion in declining to instruct the jury that it could find respondent an SVP based only on the PNOS nonconsent diagnosis. Specifically, the State argues that it was not required to plead alternative mental disorders where respondent was not prejudiced, citing *In re Detention of New*, 2013 IL App (1st) 111556.

¶ 50    The decision regarding whether to provide a particular jury instruction lies within the sound discretion of the trial court and that determination will not be disturbed absent a clear abuse of discretion. *Webber v. Wight & Co.*, 368 Ill. App. 3d 1007, 1020 (2006). An abuse of discretion occurs where " 'the instructions mislead the jury and result in prejudice to the litigant.' " *New*, 2013 IL App (1st) 111556, ¶ 64 (quoting *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 79).

¶ 51    This court recently addressed respondent's very same claim in *New*. In that case, the respondent claimed on appeal that the trial court erred in allowing the State "to elicit testimony and argue for involuntary commitment based on mental disorders not pleaded in its petition." *New*, 2013 IL App (1st) 111556, ¶ 64. This court noted that " '[f]or a variance between

allegations and proof to constitute reversible error, the variance must be shown to be material,' misleading one party to its prejudice." *New*, 2013 IL App (1st) 111556, ¶ 68 (quoting *Tomlinson v. Dartmoor Construction Corp.*, 268 Ill. App. 3d 677, 685 (1994)). Noting that "[p]rejudice often takes the form of surprise," we found that "[n]one appears here since [the respondent's] expert rebutted the State's diagnosis of substance abuse disorders and mitigated the antisocial personality disorder diagnosis." *New*, 2013 IL App (1st) 111556, ¶ 69.

¶ 52    We agree with the holding in *New* and conclude that respondent was not prejudiced by the State's failure to include all of the diagnoses alleged at trial in the SVP petition. Here, as in *New*, there was no surprise to respondent that the State would seek to commit him based on mental disorders other than just PNOS nonconsent. Dr. Wood, an expert for the State, diagnosed respondent with five conditions: (1) PNOS nonconsent, (2) pedophilia, (3) alcohol dependence, (4) cannabis dependence, and (5) personality disorder. Although only PNOS nonconsent was alleged in the SVP petition, Dr. Rosell, respondent's own expert, testified that he reviewed Dr. Wood's evaluation as part of his own evaluation of respondent. He was therefore aware of the additional diagnoses and had every opportunity to rebut them in his testimony. Respondent ultimately has failed to identify any way in which he has suffered prejudice by the State's failure to include all of the diagnoses alleged at trial in the SVP petition. His claim, therefore, must be rejected.

¶ 53                                C. *Frye* Analysis

¶ 54    Respondent next contends that the State should have been required to establish the admissibility of a PNOS nonconsent diagnosis under *Frye* because such a diagnosis is not generally accepted in the psychological community. He claims that the PNOS nonconsent diagnosis cannot be found in either the DSM-IV-TR or in the recently released DSM V. Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (4th ed., text rev. 2000 & 2013). We review *de novo* the denial of a motion *in limine* based on a *Frye* issue. *New*, 2013 IL App (1st) 111556, ¶ 47 (citing *In re Commitment of Simons*, 213 Ill. 2d 523, 531 (2004)).

¶ 55    In Illinois, the admission of expert testimony is governed by the *Frye* standard (*Simons*, 213 Ill. 2d at 529 (citing *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923))) which has been codified in the Illinois Rules of Evidence: " 'Where an expert witness testifies to an opinion based on a new or novel scientific methodology or principle, the proponent of the opinion has the burden of showing the methodology or scientific principle on which the opinion is based is sufficiently established to have gained general acceptance in the particular field in which it belongs' " (*New*, 2013 IL App (1st) 111556, ¶ 50 (quoting Ill. R. Evid. 702 (eff. Jan. 1, 2011))). "In this context, 'general acceptance' does not mean universal acceptance, and it does not require that the methodology in question be accepted by unanimity, consensus, or even a majority of experts." *Simons*, 213 Ill. 2d at 530. Rather, "it is sufficient that the underlying method used to generate an expert's opinion is reasonably relied upon by experts in the relevant field." *Simons*, 213 Ill. 2d at 530.

¶ 56    The State initially claims that *Frye* applies only to new or novel scientific methodologies and not to diagnoses. In *New*, this court rejected the same argument. *New*, 2013 IL App (1st) 111556, ¶¶ 47, 59. We noted that "a prerequisite for a diagnosis is scientific evidence that such

- 11 -

a mental condition exists" and that "[a] *Frye* hearing is appropriate to determine whether an emerging diagnosis is an actual illness or disorder." *New*, 2013 IL App (1st) 111556, ¶ 53. We also noted that "[i]f we were to accept the State's arguments, litigants could proffer fictional conditions" and that "[t]he purpose of a *Frye* hearing is to safeguard the court's truth-finding role [citation], ensuring that the fact finder cannot make findings based on unsound science." *New*, 2013 IL App (1st) 111556, ¶ 54. The reasoning in *New* holds true. We again follow *New* and reject the State's claim that *Frye* does not apply to diagnoses.

¶ 57    Having thus determined that *Frye* applies, we must next determine whether PNOS nonconsent is generally accepted in the psychological community. "A court may determine the general acceptance of a scientific principle or methodology in either of two ways: (1) based on the results of a *Frye* hearing; or (2) by taking judicial notice of unequivocal and undisputed prior judicial decisions or technical writings on the subject." *People v. McKown*, 226 Ill. 2d 245, 254 (2007). Here, the trial court relied on the latter and found that PNOS nonconsent is generally accepted in the psychological community based on the fact that "the DSM-IV does contain the diagnosis of paraphilia NOS" and also based on the decision of the Seventh Circuit Court of Appeals in *McGee v. Bartow*, 593 F.3d 556 (7th Cir. 2010). Respondent disputes this finding, claiming that PNOS nonconsent is not found in the DSM-IV-TR or the newer edition of that text, and that *McGee* does not address the issue in this case. He further cites the disagreement in the psychological community regarding the diagnosis of PNOS nonconsent and a federal district court case holding that PNOS hebephilia is too controversial to support a civil commitment (*United States v. Neuhauser*, No. 5:07-HC-2101-BO, 2012 WL 174363, at *2 (E.D.N.C. Jan. 20, 2012)).

¶ 58    We reject respondent's claim that the trial court erred in denying his motion to bar the State's experts from testifying about PNOS nonconsent. Contrary to respondent's claim, there is ample evidence to conclude that PNOS nonconsent is generally accepted within the psychological community.

¶ 59    The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders defines a paraphilia as "recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving 1) nonhuman objects, 2) the suffering or humiliation of oneself or one's partner, or 3) children or *other nonconsenting persons* that occur over a period of at least 6 months." (Emphasis added.) Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 566 (4th ed., text rev. 2000) (hereinafter DSM-IV-TR). The DSM-IV-TR also identifies specific paraphilias, including exhibitionism, fetishism, frotteurism, pedophilia, sexual masochism, sexual sadism, transvestic fetishism, and voyeurism. *Id.* at 566-67. Paraphilia is not limited to these specific classifications, though. Notably, the DSM-IV-TR contains a "residual category" entitled PNOS for "other Paraphilias that are less frequently encountered." *Id.* at 567. The authors state that "[t]his category is included for coding Paraphilias that do not meet the criteria for any of the specific categories." *Id.* at 576. Their examples of paraphilias that qualify as NOS "include, but are not limited to, telephone scatologia (obscene phone calls), necrophilia (corpses), partialism (exclusive focus on part of body), zoophilia (animals), coprophilia (feces), klismaphilia (enemas), and urophilia (urine)." *Id.*

¶ 60   The diagnosis of PNOS nonconsent is not specifically identified in the DSM-IV-TR. It nonetheless "has been the basis for numerous probable cause or sexually violent person findings in this state and other jurisdictions outside of this state." *In re Detention of Lieberman*, 2011 IL App (1st) 090796, ¶ 53, *aff'd sub nom. In re Detention of Stanbridge*, 2012 IL 112337. Our supreme court admittedly is aware of conflicting professional views regarding the validity of the PNOS nonconsent diagnosis (*Stanbridge*, 2012 IL 112337, ¶ 78); however, respondent is not able to cite a single Illinois case where a PNOS nonconsent diagnosis was rejected under *Frye* and research has turned up no such case.

¶ 61   The decision of the United States Court of Appeals for the Seventh Circuit in *McGee*, cited by the trial court, further confirms that PNOS nonconsent is controversial but, nonetheless, generally accepted in the psychological community. In that case, the seventh circuit conducted an extensive analysis of the validity of the diagnosis in addressing whether a civil commitment predicated thereon satisfied due process. *McGee*, 593 F.3d at 574. McGee, like respondent here, claimed that PNOS nonconsent was not a "listed and defined disorder" and that it thus "lack[ed] generally accepted, standardized diagnostic criteria." *McGee*, 593 F.3d at 574. There, the court noted that even the "most ardent advocates" for the PNOS nonconsent diagnosis "acknowledge that the diagnosis is 'probably ... the most controversial among the commonly diagnosed conditions within the sex offender civil commitment realm.' " *McGee*, 593 F.3d at 579 (quoting Dennis M. Doren, Evaluating Sex Offenders: A Manual for Civil Commitments and Beyond 63 (2002)). The court nonetheless found that the professional literature on the issue of whether PNOS nonconsent is a valid diagnosis came out on both sides, leading it to conclude "that the diagnosis of a paraphilic disorder related to rape is not so unsupported by science that it should be excluded absolutely from consideration by the trier of fact." *McGee*, 593 F.3d at 580.[1] The court noted that it "reach[ed] this conclusion primarily because of the Supreme Court's repeated statements that states must have appropriate room to make practical, common-sense judgments about the evidence presented in commitment proceedings." *McGee*, 593 F.3d at 580.

¶ 62   Here, the conclusion that the diagnosis of PNOS nonconsent is generally accepted in the psychological community could not be more clear. It is supported by the judicial landscape of this and other states and also by the seventh circuit's thorough analysis in *McGee*. Although respondent attempts to refute this conclusion by citing the disagreement in the psychological community regarding the diagnosis of PNOS nonconsent and one federal district court case involving a diagnosis not involved here, universal acceptance of a diagnosis is not the measure of admissibility in this state. *Simons*, 213 Ill. 2d at 530. Consequently, we reject respondent's claim that the trial court erred in allowing the State's experts to testify regarding the diagnosis of PNOS nonconsent.

---

[1]In footnotes, the court cited the professional literature to which it referred as well as cases from multiple jurisdictions where courts have concluded that "a paraphilic rape disorder can be the predicate diagnosis, or one piece of predicate diagnoses," for civil commitment.

¶ 63                        D. Failure to Hold Dispositional Hearing

¶ 64    Respondent further contends that the trial court erred in failing to hold a dispositional hearing. He claims that the plain language of the Act requires a dispositional hearing before the court enters a commitment order. The State responds that respondent has forfeited this claim by failing to object in the trial court or raise the issue in his posttrial brief.

¶ 65    We find that respondent has forfeited his claim that the trial court erred in failing to hold a dispositional hearing before entering the order of commitment where he did not raise the issue in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Forfeiture notwithstanding, the trial court's failure to hold a dispositional hearing does not, as respondent claims, require vacatur of the commitment order and a remand for a dispositional hearing.

¶ 66    This court has recently held in two separate cases that a dispositional hearing is required under the Act. *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 63; *In re Commitment of Fields*, 2012 IL App (1st) 112191, ¶ 73, *appeal allowed*, No. 115542 (May 29, 2013). In *Butler*, however, this court declined to vacate the commitment order where respondent "never indicated that he had a witness, or any evidence, to present at the dispositional hearing and was prevented from doing so." *Butler*, 2013 IL App (1st) 113606, ¶ 64. There, "[t]he only request made on behalf of respondent was for the matter to be continued so that a supplemental examination of respondent could be performed." *Butler*, 2013 IL App (1st) 113606, ¶ 64. This court noted that "[t]he adjournment of the dispositional hearing for that purpose alone is within the sole discretion of the trial court." *Butler*, 2013 IL App (1st) 113606, ¶ 64 (citing *Fields*, 2012 IL App (1st) 112191, ¶ 73).

¶ 67    Here, as in *Butler*, respondent has never indicated that he was prevented from presenting particular witnesses or evidence at the dispositional hearing. We follow *Butler* and conclude that there is no need to vacate the commitment order and remand this matter for a dispositional hearing. *Butler*, 2013 IL App (1st) 113606, ¶ 64.


¶ 68                            E. Sufficiency of the Evidence

¶ 69    Respondent lastly contends that the State failed to prove that he was an SVP beyond a reasonable doubt. His sole argument is that the State failed to produce any evidence that he had a "legitimate" mental disorder where the testimony of Dr. Wood and Dr. Tsoflias was based on a "non-existent diagnosis." This argument is nothing more than a rehash of respondent's argument that the PNOS nonconsent diagnosis is inadmissible under *Frye*. Having already found that PNOS nonconsent is a generally accepted diagnosis, we also reject respondent's challenge to the sufficiency of the evidence.


¶ 70                                  III. CONCLUSION

¶ 71    For the reasons stated, we affirm the judgment of the circuit court of Cook County.


¶ 72    Affirmed.